Filed 10/16/20  Pruchink v. Salpietra CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ROBERT PRUCHNIK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RICHARD SALPIETRA,<br><br>    Defendant and Respondent. | D075216<br><br><br><br>(Super. Ct. No. 37-2018-<br>  00025327-CU-BT-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.

Norman Shaw & Associates and Norman Shaw for Plaintiff and Appellant.

Pettit Kohn Ingrassia Lutz & Dolin, Douglas A. Pettit, and Jocelyn D. Hannah for Defendant and Respondent.

Plaintiff Robert Pruchnik appeals an order granting defendant Richard Salpietra's special motion to strike under Code of Civil Procedure section 425.16 (section 425.16), commonly known as the anti-SLAPP statute. Pruchnik owns a detached condominium unit in a common interest development managed by the Oaks North Homeowner's Association (HOA).

Salpietra is an attorney. In the midst of a dispute over Pruchnik's request that the HOA replace the roof on his unit, the HOA retained Salpietra to represent it. The dispute continued unabated, and eventually the HOA replaced the roof over Pruchnik's objections.

Pruchnik filed this lawsuit against the HOA, its president, its property manager, and Salpietra. He alleged causes of action for unfair business practices, intentional and negligent infliction of emotional distress, defamation, financial elder abuse, and "aiding and abetting."

Salpietra responded by filing the special motion to strike. He argued that Pruchnik's claims were based on statements made in anticipation of litigation and were therefore protected under the anti-SLAPP statute. He argued further that Pruchnik could not show a probability of prevailing because the statements were absolutely privileged under Civil Code section 47, subdivision (b) based on their relationship to anticipated litigation. The trial court agreed and granted the motion.

On appeal, Pruchnik contends the court erred by finding his claims were based on statements protected by the anti-SLAPP statute and he could not show a probability of prevailing. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

For years, Pruchnik requested that the HOA repair the damaged roof on his condominium unit. In September 2016, Pruchnik retained an attorney to represent him in his dealings with the HOA. Several months later, she wrote to the HOA accusing it of ignoring Pruchnik's requests and her own. After recounting various points of contention, her letter requested a reply "so we can work this out or set the procedures in motion for Alternative Dispute Resolution." The letter concluded, "If I do not hear from your counsel, since I am sure the association[] has one, I will assume that you intend to ignore

2

your legal obligations and those of the provision of the Davis Sterling Act have been waived [*sic*] and I will discuss further legal action with my client."[1]

Two weeks later, Pruchnik retained a new attorney to represent him. The attorney sent a demand letter to the HOA's property manager identifying various defective conditions in Pruchnik's unit, including the roof, that Pruchnik believed the HOA was responsible for repairing. The attorney wrote, "As you know Mr. Pruchnik is an elderly gentleman and is dealing with a recent tragedy. He feels that the Association has not taken him seriously, has ignored him, and has been repeatedly intimidating and abusive by making comments like: 'you missed your chance to arbitrate;' 'I need an immediate answer on allowing an inspection or I will cancel it;' and 'see you in court.' "

In response, an attorney for the HOA wrote that Pruchnik was being uncooperative and obstructing the HOA's efforts to address the alleged defects. Her letter reminded Pruchnik of his obligations under the development's governing documents and the HOA's authority over common areas. It concluded by accepting the offer by Pruchnik's prior attorney to mediate the dispute.

An inspector hired by the HOA examined the roof. He recommended that it be replaced. He suggested reusing the existing roof tiles and installing new underlayment (a so-called "lift-and-lay" technique).

---

[1] The Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.) governs common interest developments in California. Some form of alternative dispute resolution is generally a prerequisite to filing certain civil actions under the act. (*Id.*, § 5930.)

Pruchnik objected to the reuse of existing tiles. His attorney wrote, "The Association's proposal to install a 'new' roof using the old tiles is a non-starter. It is ill-advised and an aggressive bullying tactic." He requested that the HOA's attorney respond to his proposed mediator. After some delay, the HOA rejected Pruchnik's proposed mediator and offered an alternative candidate. Pruchnik's attorney responded that, based on his analysis, his client was no longer required to participate in mediation or other alternative dispute resolution because of the HOA's delay. The HOA's attorney disputed this analysis. She wrote, "The Board believes it is in the best interest of both parties to attempt to resolve this matter amicably, especially before incurring the significant expense of litigation, which you have repeatedly threatened."

The dispute over the parameters of Pruchnik's roof repair continued. The HOA attempted to schedule the repair, but Pruchnik maintained his opposition to reusing the existing roof riles. In advance of another scheduled repair, the HOA's attorney wrote that Pruchnik could be penalized by the HOA for any interference. She continued, "Additionally, he may be offered mediation as a final means of attempting to resolve this matter without litigation. Alternatively, the Association may have no choice but to commence litigation since the Association's prior efforts to mediate with him were rebuffed, and the Association needs to complete roof work to protect the property. [¶] We strongly suggest that you advise Mr. Pruchnik of the high likelihood that the Association will prevail if litigation proves necessary." The attorney noted that the prevailing party in any such lawsuit would be entitled to an award of attorney fees and costs.

Two weeks later, in January 2018, the HOA retained Salpietra as its "special counsel" to handle the dispute with Pruchnik, among other issues. Pruchnik's attorney sought confirmation that the scheduled roof repair would

4

be delayed pending further discussions. He wrote the HOA's property manager, "Please postpone the roofing crew until we have a chance to work things out. Otherwise Mr. Pruchnik will be forced to take further action to prevent damage to his property by the Association." Salpietra confirmed that the roof repair was no longer scheduled.

In the ensuing discussions, Pruchnik's attorney informed Salpietra that Pruchnik wanted to install solar panels at the same time as the roof replacement. Salpietra responded that the HOA would accept Pruchnik's demand for new roof tiles and allow Pruchnik to install solar panels if he agreed to pay for the increased price of new tiles and "assume liability for the solar panels and the roof over which they sit. In other words, if the solar panels are going to take the place of roof tile, he would be responsible for the solar panel installation and the roof below it."

A month later, Salpietra wrote Pruchnik's attorney and informed him that they would be scheduling the lift-and-lay roof repair since he had not responded to the HOA's proposal. Pruchnik's attorney objected again. In response, Salpietra wrote, "The board and I have tried to work with Mr. Pruchnik and you for months, and it is he and you that are obstructing the work. You are the one that threatened litigation when the roofers tried to fix the roof, and he blocked their trucks from entering his property." Pruchnik's attorney denied that his client had obstructed the work or blocked roofing trucks from entering the property. He denied threatening litigation "that [he] can tell" but told Salpietra to correct him if he was wrong.

The scheduled roof repair was called off again. To bring the issue before the board, Salpietra requested assurances that Pruchnik would pay the increased cost for new tiles, that he would be responsible for the solar panel installation and continued use, and that he would be responsible for

any leaks caused by the panels. Pruchnik's attorney asked Salpietra to provide the figure for the increased cost at his earliest opportunity.

Five days later, Salpietra responded that the cost difference would be $8,500. He wrote, "Therefore, if Mr. Pruchnik is willing to pay the difference of $8,500, the board would consider putting on all new roof tile. Also, the roofer said that they install the tile across the whole roof, and the solar panels are placed over the roof tiles. . . . [¶] Therefore, if Mr. Pruchnik wants to install solar panels as you have provided, the board would allow it, but he would have to sign a Maintenance & Indemnity agreement that makes him responsible for the roof and the solar panel installation, and he would indemnify the HOA for any problems caused thereby, and it would have to be recorded for subsequent buyers of the property to be aware of this obligation."

Pruchnik's attorney wrote that his client would pay the increased cost but "we would like an opportunity to review the supporting documentation." Salpietra responded, reiterating the board's terms and requesting payment and confirmation by the following week. He noted that the roof repair had been scheduled and "[t]he board will not accept any more delays . . . ."

Pruchnik's attorney informed Salpietra, "The check is in the mail," but he did not respond to the board's other terms. Salpietra forwarded a proposed maintenance and indemnity agreement for Pruchnik to sign. Pruchnik's attorney responded that, while he had not been able to meet with his client about the agreement, he was concerned that the scope differed from Salpietra's original representation because it "greatly increases Mr. Pruchnik's responsibility for the roof over what you explained in the past . . . ." He explained that Pruchnik had not yet had the opportunity to select the new tile for the roof. He requested that the scheduled roof repair be delayed.

6

On behalf of the board, Salpietra did not agree to a further delay. He noted that the roof repair should already have begun, but "[i]t took a few days for the roofer to get the new roof tile. The tile has been selected and the roofers are starting on Monday. There can be no more delays. As I said to you before, the solar panels must be placed *over* the roof tiles. Also, as I said to you before, if Mr. Pruchnik wants to install solar panels, he must assume the maintenance obligation of the entire roof since the HOA will not be able to maintain part of a roof."

The following Monday, the roof repair on Pruchnik's unit began, over the objections of Pruchnik and his attorney. The next day, Pruchnik filed this lawsuit against the HOA, its president, its property manager, and Salpietra.

Pruchnik's complaint alleges causes of action for unfair business practices (Bus. & Prof. Code, § 17200 et seq.), intentional and negligent infliction of emotional distress, defamation, financial elder abuse (Welf. & Inst. Code, § 15610.30), and "aiding and abetting." Pruchnik alleged that the HOA had refused his requests to replace his roof for years, attempted to coerce him into accepting an improper "lift-and-lay" repair (while his neighbors received new tile roofs), forced him to accept brown tiles (when he wanted red), and thwarted his effort to install solar panels.

As to Salpietra, Pruchnik alleged he was the HOA's attorney and had communicated with Pruchnik's attorney as discussed above. Pruchnik alleged that Salpietra made two false statements: (1) Pruchnik had blocked his driveway to prevent a scheduled roof repair, and (2) Pruchnik had selected brown tile for his roof. Pruchnik also alleged that Salpietra improperly changed the terms of the proposed maintenance and indemnity

7

agreement to expand the scope of Pruchnik's obligations to include the entire roof, rather than the roof directly underneath the solar panels.

For his unfair business practices cause of action, Pruchnik alleged, "Defendants' tactics violate various Civil Code sections, including section 4746, and other sections which prohibit misrepresentation, defamation, false pretenses, favoritism, intentional infliction of emotional distress, conversion and elder abuse." For his intentional and negligent infliction of emotional distress causes of action, Pruchnik alleged, "Defendants abused their position of authority, apparent or actual, over Plaintiff's interests. Defendants sought, because of his age, to intimidate Plaintiff with threats of significant attorneys' fees and by setting forth unlawful and unreasonable conditions, into accepting an unsatisfactory replacement roof" and "Defendants breached their duty [to treat Pruchnik fairly] when they conducted a strategy of intimidation and dishonest dealing intended to deny Plaintiff his right to obtain the roof for which he had paid; and for the solar installation for the design of which he had spent time and money; had properly made application for permission from Defendants for its installation; and, was granted permission by Defendants for the solar system's installation." (Some capitalization omitted.) Pruchnik's defamation claim relied on the statement that he had blocked his driveway to prevent a roof installation and had the roofers removed from his property. For his financial elder abuse cause of action, Pruchnik alleged that the defendants had obtained $8,500 based on an agreement that he would be able to select the new roof tile. But the defendants "arbitrarily moved ahead with a reroofing" without Pruchnik's consent.

Pruchnik named Salpietra as a defendant only in connection with his causes of action for unfair business practices and defamation, but he alleged

that Salpietra aided and abetted the HOA's "intent to abuse, intimidate, and deceive" him. Pruchnik requested compensatory and punitive damages, injunctive relief, and attorney fees and costs.

Salpietra filed a special motion to strike under the anti-SLAPP statute. Salpietra argued that Pruchnik's claims against him "all stem from litigation-related communications with [Pruchnik's] counsel to try to resolve the dispute between [Pruchnik] and [the HOA] as to how his roof would be repaired." As such, they were within the scope of the anti-SLAPP statute. Moreover, they were protected by the litigation privilege, so Pruchnik could not show a probability of prevailing on his claims.

Salpietra submitted a declaration in support of his motion. He stated that he represented the HOA in its dispute with Pruchnik. He communicated with Pruchnik's attorney on behalf of the HOA. He never met or spoke to Pruchnik himself. He stated, "It was my understanding at the time that I was retained that the Association's prior counsel had considered initiating a lawsuit against [Pruchnik], seriously, and in good faith, in order to enforce the Association's rights and obligation to complete repairs to [Pruchnik's] roof in the manner it deemed appropriate. Litigation was considered a likely option as I was advised that [Pruchnik] had obstructed numerous prior attempts to perform these (and other) repairs by blocking contractors' access to his home. It was further my understanding that [Pruchnik] had threatened litigation regarding the dispute numerous times in the preceding year."

In opposition, Pruchnik argued that Salpietra could not show that litigation was seriously contemplated in good faith because the HOA's litigation threats were "nothing more than instances of the HOA's heavy-handed, abusive negotiation tactics designed to terrorize the elderly

9

Plaintiff." He argued further that his claims had the minimal merit necessary to survive a special motion to strike.

Pruchnik submitted his own declaration in opposition to Salpietra's motion. He recounted the early history of the dispute and his prior attorney's request to mediate. He explained that his new attorney did not believe mediation was necessary to resolve the dispute. Pruchnik stated, "I did not want to spend the money on mediation, I did not want to spend money on litigation, and I certainly did not plan to initiate any litigation over the repairs." He believed, however, that the HOA's proposal to do a "lift-and-lay" roof replacement was inadequate because the old tile was extremely brittle and physically unsound. He denied blocking the roofers' access to his driveway. When a roofer came to measure his roof, they did not discuss tile color. He stated, "I never selected brown tile. I did not want brown tile and I never told anyone that I wanted brown tile. I did not tell the Association's roofer that I wanted brown tile." He wanted red, curved tile. He concluded, "The Association refused to accommodate my wishes for the red tile even after I paid $8500.00. The Association refused to allow me the time needed to coordinate the solar panel installation." And, "The Association refused to allow me to install solar panels unless I signed a highly unfair, onerous, and illegal maintenance agreement in violation of applicable Statute(s)."

The trial court granted Salpietra's special motion to strike. Its minute order explained, "As pled, all of the allegations against Salpietra arise out of Salpietra's alleged conduct in his capacity as counsel for [the HOA] and with respect to [Pruchnik's] requested roof repair." It found, based on the allegations of the complaint and the correspondence between attorneys, that "at the time of Salpietra's retention, and throughout Salpietra's retention, litigation was anticipated and contemplated by the parties and was

10

imminent." For the same reason, Salpietra's statements were protected by the litigation privilege and Pruchnik could not show a probability of prevailing on his claims. Pruchnik appeals.

DISCUSSION

I

*Anti-SLAPP Principles*

" 'Code of Civil Procedure section 425.16 sets out a procedure for striking complaints in harassing lawsuits that are commonly known as SLAPP suits . . . , which are brought to challenge the exercise of constitutionally protected free speech rights.' [Citation.] A cause of action arising from a person's act in furtherance of the 'right of petition or free speech under the [federal or state] Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability' that the claim will prevail. (§ 425.16, subd. (b)(1).) 'The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity. Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts

11

the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.  [Citation.] "[C]laims with the requisite minimal merit may proceed." ' [Citation.]  'We review de novo the grant or denial of an anti-SLAPP motion.' " (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater Union*).)

Although our review is de novo, it is limited to issues adequately raised and supported in Pruchnik's briefing.  (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554-555; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)  Pruchnik "has the burden of showing error, even if he did not bear the burden in the trial court." (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230.)  " 'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

II

*"Arising From" Protected Activity*

Pruchnik first contends the trial court erred by finding that his claims against Salpietra arose from protected activity.  In his opening brief, Pruchnik describes the basis for his claims as the following:  (1) Salpietra "[m]ade the false statement that Pruchnik blocked his driveway with his car to prevent the roofers from climbing on his roof and instituting repairs," (2) Salpietra "[f]alsely stated that Pruchnik chose brown tile after collecting $8,500 from him for new Spanish-style red roofing tile," and (3) Salpietra

12

"[c]hanged the maintenance agreement in order to prevent Pruchnik from installing a solar system." Salpietra concurs in this description.

"The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*).)

The category of protected activity at issue in this appeal is "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).) "This includes statements or writings made in connection with litigation in the civil courts. [Citation.] The statute does not require any showing that the matter being litigated concerns a matter of public interest." (*Healy v. Tuscany Hills Landscape & Recreation Corp.* (2006) 137 Cal.App.4th 1, 5.)

In addition to statements or writings made in connection with pending litigation, " 'communications preparatory to or in anticipation of the bringing of an action or other official proceeding' " are protected under the anti-SLAPP statute. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) "Accordingly, although litigation may not have commenced, if a

13

statement 'concern[s] the subject of the dispute' and is made 'in anticipation of litigation "contemplated in good faith and under serious consideration," ' [citation] then the statement may be petitioning activity protected by section 425.16." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268 (*Neville*).) "The 'good faith [and under] serious consideration' requirement is not a test for malice. [Citation.] Instead, it focuses on whether the litigation was genuinely contemplated. [Citation.] The requirement guarantees that hollow threats of litigation are not protected." (*People ex rel. Fire Insurance Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 824 (*Fire Insurance*).)

"Courts have adopted a 'fairly expansive view' of litigation-related conduct to which section 425.16 applies." (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1125.) " ' "Under the plain language of section 425.16, subdivision (e)(1) and (2), as well as the case law interpreting those provisions, *all* communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute." ' [Citation.] Cases construing the anti-SLAPP statute hold that 'a statement is "in connection with" litigation under section 425.16, subdivision (e)(2), if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation.' [Citation.] Consequently, because settlement negotiations are regarded as an exercise of the right to petition, communications during such negotiations are regarded as having been made in connection with the underlying lawsuit for purposes of section 425.16, subdivision (e)(2)." (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 113-114 (*Optional Capital*).)

14

For example, courts have held that "a demand letter sent in anticipation of litigation is a legitimate speech or petitioning activity that is protected under section 425.16." (*Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1293; accord, *Fire Insurance, supra*, 211 Cal.App.4th at p. 825.) Similarly, a letter sent by an employer to its customers alleging that a former employee had misappropriated its trade secrets was held to be protected, even though litigation was not filed until four months later. (*Neville, supra*, 160 Cal.App.4th at pp. 1267-1269.)

The opinion in *Rohde v. Wolf* (2007) 154 Cal.App.4th 28 (*Rohde*) is instructive. Two family members, a brother and a sister, disagreed about the distribution of their deceased father's assets. (*Id*. at p. 32.) The brother's attorney wrote to the sister's attorney addressing a number of issues in dispute. (*Ibid*.) The sister's attorney responded with threats of litigation. (*Ibid*.) Later, the parties agreed to sell certain property and split the proceeds. (*Id*. at p. 33.) Communications regarding the sales listing broke down, and the brother's attorney attempted unsuccessfully to reach the listing agent. (*Ibid*.) The brother's attorney left a voicemail message expressing his dissatisfaction and stating, " 'I believe you are obviously engaged in a conspiracy to defraud my client with [the sister] and I plan on taking appropriate action.' " (*Ibid*.) He left a second voicemail with the same accusation. (*Ibid*.) The sister sued the brother's attorney for slander. (*Id*. at p. 34.) The attorney filed an anti-SLAPP motion, which the trial court denied. (*Ibid*.) Separately, the sister sued her brother on the underlying dispute over their father's assets. (*Ibid*.)

The reviewing court reversed the order denying the attorney's anti-SLAPP motion. (*Rohde, supra*, 154 Cal.App.4th at p. 32.) It held that the attorney's voicemail messages were protected communications because they

15

related to litigation that was contemplated in good faith and under serious consideration. (*Id.* at p. 36.) Both parties had threatened litigation in the dispute regarding their father's assets. (*Id.* at p. 37.) In the midst of a partial resolution of that dispute (the sale of property), further disagreements arose and the brother's attorney left the allegedly slanderous voicemails. (*Ibid.*) The court explained that "the spectre of litigation loomed over all communications between the parties at that time. Thus, the messages concerning the subject of the dispute and threatening appropriate action in that context had to be in anticipation of litigation 'contemplated in good faith and under serious consideration.' " (*Ibid.*)

Pruchnik's claims against Salpietra in this litigation are likewise based on statements or writings made in connection with litigation contemplated in good faith and under serious consideration. The claims arise from Salpietra's communications with Pruchnik's attorney where Salpietra allegedly made false statements or improperly changed the terms of a proposed agreement. Even before Salpietra was retained by the HOA, the record shows that litigation was seriously contemplated in good faith by both Pruchnik and the HOA. Pruchnik's prior attorney initiated the dispute resolution process that must precede certain civil actions against the HOA. (See Civ. Code, § 5930.) If the HOA did not respond, the attorney warned, she would "discuss further legal action with [her] client." Two weeks later, Pruchnik's new attorney sent a formal demand letter to the HOA. The letter noted that the HOA had made threats of litigation in the past. In subsequent correspondence, Pruchnik's attorney contended that he was no longer obligated to participate in any form of alternative dispute resolution before filing suit, based on the HOA's delays in responding. The HOA's attorney responded, "The Board believes it is in the best interest of both parties to attempt to resolve this matter amicably,

16

especially before incurring the significant expense of litigation, which you have repeatedly threatened." As the disputes continued, the HOA's attorney again raised the prospect of litigation: "Alternatively, the Association may have no choice but to commence litigation since the Association's prior efforts to mediate with him were rebuffed, and the Association needs to complete roof work to protect the property." She asserted there would be a "high likelihood" the HOA would prevail in any litigation and noted that the prevailing party would be entitled to attorney fees and costs. Thus, even before Salpietra was retained, Pruchnik's attorney had sent a formal demand letter, he had commenced (and, in his view, completed) the alternative dispute resolution requirement to bring suit, and both sides had threatened litigation. These facts show that litigation was seriously contemplated in good faith at the time.

After Salpietra was retained, litigation remained a genuine prospect. Pruchnik's attorney demanded that one scheduled repair be called off, "[o]therwise Mr. Pruchnik will be forced to take further action to prevent damage to his property by the Association." After the parties failed to resolve their disputes over new tiles and solar panels, Salpietra wrote, "The board and I have tried to work with Mr. Pruchnik and you for months, and it is he and you that are obstructing the work. You are the one that threatened litigation when the roofers tried to fix the roof, and he blocked their trucks from entering his property." Although some progress was made, the parties never reached resolution. The HOA moved forward with the roof repair over Pruchnik's repeated objections. Salpietra wrote, "There can be no more delays." The day after the roof repair began, Pruchnik filed this lawsuit.

Given this history, "the spectre of litigation loomed over all communications between the parties" both before and after Salpietra was

17

retained. (See *Rohde*, *supra*, 154 Cal.App.4th at p. 37.) Demands had been made, the prelitigation process had begun, and actual litigation had been repeatedly threatened. Salpietra's involvement appears to have coincided with even more disputes between the parties—despite the parties' efforts to resolve the dispute. The record shows that litigation was seriously contemplated in good faith. Because Salpietra's statements and writings were related to the substance of the anticipated litigation, and indeed were directed at settlement of such litigation, they were "in connection with" litigation for purposes of the anti-SLAPP statute. (§ 425.16, subd. (e)(2); see *Optional Capital*, *supra*, 18 Cal.App.5th at p. 114 [settlement communications are protected].)

Pruchnik argues that Salpietra's "abusive conduct is independent of any 'litigation' activities, because litigation had not even been considered until Salpietra altered the maintenance agreement and ordered the roofers to get to work, regardless of the agreement with Pruchnik." He claims, "The parties did not seriously contemplate litigation at that time, despite their tactical bravado and slinging of empty threats." We disagree with Pruchnik's interpretation of the record. The dispute over Pruchnik's roof was long-running and had grown quite heated before Salpietra had ever been retained (or made the challenged statements). In this dispute, Pruchnik first retained an attorney, who soon began the alternative dispute resolution process necessary to bring suit against the HOA to force repairs to his unit. She referenced "further legal action" if the HOA did not respond. Pruchnik then retained a second attorney, whose first communication appears to have been a formal demand letter to the HOA. The HOA then retained an attorney, and the litigation threats continued. Pruchnik's attorney contended he was no longer bound to participate in alternative dispute resolution. The HOA's

18

attorney raised the prospect of litigation, asserted the HOA had a high likelihood of prevailing, and noted that the prevailing party would be able to obtain attorney fees and costs.  Only then was Salpietra retained.  Regardless, the litigation threats continued.

This history shows that the potential for litigation over Pruchnik's roof repairs was real; it was not a matter of mere rhetoric.  The parties' dispute was concrete and long-running.  Both parties were represented by attorneys.  Both parties made specific, formal demands.  The threats of litigation were seriously offered and reflected a sober appraisal of the difficulty of resolving the dispute short of such proceedings.  Litigation was seriously contemplated in good faith long before the HOA proceeded with the roof repair over Pruchnik's objections, and certainly before Salpietra's statements and writings at issue here.

In his reply brief, Pruchnik reframes his contentions.  He argues that his claims against Salpietra do not arise from Salpietra's statements and writings, but from his "breach" of various duties and obligations.  Pruchnik asserts that his claims are based on aiding and abetting a "bullying scheme" perpetrated by all the defendants.  Even assuming that Pruchnik has not waived these arguments by making them for the first time on reply (see *Orange County Water Dist. v. MAG Aerospace Industries, Inc.* (2017) 12 Cal.App.5th 229, 250), they are unpersuasive.  "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Wilson, supra,* 7 Cal.5th at p. 884.)  "Thus we examine 'the specific acts of wrongdoing' alleged," not their legal consequences.  (*Bergstein v. Strook & Strook & Lavan LLP* (2015) 236 Cal.App.4th 793, 811 (*Bergstein*).)

19

Pruchnik's defamation claim is clearly based on Salpietra's allegedly false statements. Pruchnik's unfair competition and "aiding and abetting" claims are based on these statements, as well as Salpietra's statements and writings regarding the scope of the maintenance and indemnity agreement. These statements and writings are the "bullying scheme" allegedly perpetrated by Salpietra, as described in Pruchnik's complaint. Pruchnik makes much of the deceptive nature of Salpietra's statements and writings, but his arguments only confirm that his claims are based on these statements and writings, which are protected by the anti-SLAPP statute. (See *Optional Capital, supra*, 18 Cal.App.5th at p. 114 ["The protection of the anti-SLAPP statute applies 'even against allegations of fraudulent promises made during the settlement process.' "].) Salpietra's statements and writings are not merely evidence of "breach," they are the alleged injury-producing conduct themselves.[2]

Pruchnik cannot avoid this conclusion by alleging conspiracy or aiding and abetting. (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 413 (*Contreras*).) They "are no more than legal conclusions" and have " 'no

---

[2] Pruchnik cites a number of opinions involving claims for professional negligence or breach of fiduciary duty against attorneys by former clients. But, as other courts have recognized, such opinions are distinguishable because the alleged wrongful conduct is not simply the attorney's litigation-related statements or writings, but noncommunicative conduct such as accepting representation adverse to the client-plaintiff. (See, e.g., *Bergstein, supra*, 236 Cal.App.4th at p. 813; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 967-968.) Pruchnik also cites *Moore v. Shaw* (2004) 116 Cal.App.4th 182, but it involved attorney conduct unrelated to any litigation. The plaintiff's claims "did not arise from protected activity by [the attorney]; they arose from her drafting the termination agreement . . . well before the inception of any judicial proceedings." (*Id*. at p. 197.) Here, by contrast, Salpietra's statements and writings were all in connection with anticipated litigation and therefore protected.

talismanic significance[.]' " (*Ibid*.) Likewise, allegations of unprotected conduct by other defendants—whose contractual and legal duties to Pruchnik are far different—have little bearing on our inquiry into the basis of Salpietra's alleged liability. If a defendant's liability is based only on protected conduct, the fact that other defendants engaged in unprotected conduct is irrelevant. Where, as here, the claims against a defendant would have no basis in the absence of the defendant's protected activity, the claims are subject to the anti-SLAPP statute. (*Id*. at p. 412.)

Pruchnik also argues that the public policy behind the anti-SLAPP statute would not be served by protecting Salpietra's statements and writings. He alludes to fights between "the 'little guy' " and "the 'big guy' " and his supposed disadvantaged position. But these complaints provide no basis for us to disregard the statute's scope, based on its plain language and binding precedent. As one commentator has explained, "SLAPP suits are not limited to suits by 'big guys' against 'little guys.' Even 'deep pocket' defendants can invoke [section] 425.16 when sued for free speech activities." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2020) ¶ 7:829.)

Pruchnik also argues that the anti-SLAPP statute was intended to apply to meritless cases, while "[t]his is a case of oppressive and unethical conduct by a homeowners' association and its attorney toward an elderly homeowner." The merits of Pruchnik's claims are not at issue when considering whether they arise from protected activity. The merits are addressed in the second step. "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being

21

stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).) We turn next to the second step.[3]

## III

### *Probability of Prevailing*

"[N]o cause of action qualifies as a SLAPP merely because the defendant's actions conceptually fall within the ambit of the statute's initial prong. Despite the fact [the defendant] has made a threshold showing that plaintiff['s] action is one arising from statutorily protected activity, plaintiff[] may defeat the anti-SLAPP motion by establishing a probability of prevailing on [his] claim." (*Navellier*, *supra*, 29 Cal.4th at p. 95.)

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.] In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being

---

3    In light of our conclusion that Salpietra's alleged activities are protected under section 425.16, subdivision (e)(2) as statements or writings in connection with anticipated litigation, we need not consider Salpietra's additional argument that they are protected under the catch-all provision of subdivision (e)(4) as well.

22

stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.) "[A] plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Sweetwater Union*, *supra*, 6 Cal.5th at p. 940.)

Pruchnik contends the trial court erred by relying on the litigation privilege to find that Pruchnik could not show a reasonable probability of prevailing on his claims. " 'A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim.' " (*Bergstein*, *supra*, 236 Cal.App.4th at p. 814; accord, *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065 (*Rusheen*).)

"A privileged publication or broadcast is one made . . . [i]n any . . . judicial proceeding . . . ." (Civ. Code, § 47, subd. (b).) " 'Although originally enacted with reference to defamation [citation], the privilege is now held applicable to any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution. [Citations.] Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved. [Citations.] [¶] The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. [Citations.]' [Citation.] Thus, 'communications with "some relation" to judicial proceedings' are 'absolutely immune from tort liability' by the litigation privilege [citation]. It is not limited to statements made during a trial or other proceedings, but may

23

extend to steps taken prior thereto, or afterwards." (*Rusheen, supra*, 37 Cal.4th at p. 1057.)

" 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' [Citation.] In order to achieve this purpose of curtailing derivative lawsuits, [the Supreme Court has] given the litigation privilege a broad interpretation." (*Action Apartment Association, Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).) " ' "Any doubt about whether the privilege applies is resolved in favor of applying it." ' " (*Contreras, supra*, 5 Cal.App.5th at p. 415.)

Although the scope of the litigation privilege and the scope of the anti-SLAPP statute are not identical, they are quite similar under the circumstances here. "To be protected by the litigation privilege, a communication must be 'in furtherance of the objects of the litigation.' [Citation.] This is 'part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action.' [Citation.] A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment, supra*, 41 Cal.4th at p. 1251; see *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 34-36.) We have already explained why Salpietra's statements and writings were related to litigation that was contemplated in good faith and under serious consideration. Thus, for the same reasons that Salpietra's statements and writings are protected under the anti-SLAPP statute, they are protected by the litigation privilege. (See *Rohde, supra*, 154 Cal.App.4th at p. 38.)

Pruchnik again takes the position that any litigation threats were merely "negotiating tactics" and litigation was not seriously contemplated. We reject this position for the reasons we have already discussed. Pruchnik cites *Kimmel v. Goland* (1990) 51 Cal.3d 202, but it is inapplicable. In *Kimmel*, the Supreme Court considered whether the litigation privilege applied to the unlawful recording, in anticipation of litigation, of confidential telephone conversations. (*Id.* at p. 205.) It concluded the privilege applied to "*publications* or *broadcasts* made during the course of judicial and quasi-judicial proceedings, but does not bar recovery for injuries from tortious *conduct* regardless of the purpose for which such conduct is undertaken." (*Ibid.*) Here, as noted, Pruchnik's claims are based on Salpietra's communications (statements and writings) in connection with anticipated litigation, not noncommunicative conduct. Indeed, in his briefing, Pruchnik repeatedly describes Salpietra's conduct as "bullying," which is essentially a communicative wrong based on the circumstances presented here.

As in the anti-SLAPP context, Pruchnik cannot avoid this result by pointing to allegations in his complaint of aiding and abetting. (See *Bergstein*, *supra*, 236 Cal.App.4th at p. 815.) Nor can he rely on other allegations without any evidentiary basis in the record. (See *Sweetwater Union*, *supra*, 6 Cal.5th at p. 940; *Optional Capital*, *supra*, 18 Cal.App.5th at p. 119 [" 'The prima facie showing of merit must be made with evidence that is admissible at trial. [Citation.] Unverified allegations in the pleadings or averments made on information and belief cannot make the showing.' "].) To the extent Pruchnik relies on the bare existence of an attorney-client relationship between Salpietra and the HOA as a basis for liability, we reject such reliance. (See *Optional Capital,* at p. 118; *Contreras*, *supra*, 5 Cal.App.5th at pp. 417-418.)

On reply, Pruchnik asserts that Salpietra's "bullying scheme" does not satisfy the elements of the litigation privilege because the "bullying scheme" is not a judicial proceeding, it is not authorized by law, it was intended to deprive Pruchnik of his rights, and it was not connected to litigation. This assertion misinterprets the elements of the litigation privilege, and it is unpersuasive. "[C]ommunications made in connection with litigation do not necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 920.) As we have discussed, the statements and writings that comprise the alleged bullying scheme were made in connection with anticipated litigation, by a litigant or participant authorized by law, to achieve a litigation-related objective (i.e., settlement), with some logical connection to the anticipated litigation. (See *Rusheen*, *supra*, 37 Cal.4th at p. 1057.) The litigation privilege therefore applies.

Because the litigation privilege provides a complete defense to Pruchnik's claims, the trial court did not err by finding that Pruchnik did not show a reasonable probability of prevailing. We therefore need not consider whether Pruchnik did not show a reasonable probability of prevailing for other reasons as well.

DISPOSITION

The order is affirmed.  Salpietra shall recover his costs on appeal.


GUERRERO, J.

WE CONCUR:



McCONNELL, P. J.



O'ROURKE, J.